UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-80036-CR-MARRA

UNITED STATES OF AMERICA   )
                           )
v.                         )
                           )
EDWARD KLAPP IV,           )
                           )
    Defendant.             )
_____)

## FACTUAL PROFFER

The United States of America and the defendant, EDWARD KLAPP IV, hereby agree that, had this case proceeded to trial, the United States would have proved beyond a reasonable doubt the following facts, which occurred in the Southern District of Florida:

Smart Lab LLC (hereinafter "Smart") was located at 10385 Ironwood Road, Suite 130, Palm Beach Gardens, Florida. Since Smart's inception in 2014, H. Hamilton Wayne, a/k/a "Hawkeye," was an authorized member, and his brother, Justin, was a managing member. Hawkeye functioned as the Chief Executive Officer of Smart and was the main decision maker for the business. Wayne functioned as the Chief Operating Officer of Smart and handled many of the day-to-day operations of the business.

Smart offered bodily fluid testing services, including confirmatory urinalysis testing. Like other medical tests, bodily fluid testing, including confirmatory urinalysis testing, could be billed to Medicare, and reimbursed pursuant to Medicare's terms. Smart obtained its own Medicare Identification Number and filed Medicare claims on behalf of the referring health care provider.

On or about April 24, 2015, the defendant, EDWARD KLAPP IV (hereinafter "KLAPP") met with Justin Wayne at Smart, to discuss becoming a "sales representative" for Smart. KLAPP would refer laboratories to Smart for business, in exchange for a "commission" in direct correlation to the amount Smart received from insurance billings on KLAPP's accounts, including Medicare. KLAPP

later signed an agreement with Smart in which he acknowledged that the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Florida Patient Brokering Act "apply when an individual offers or makes payments to another person in order [to] induce referrals or other prohibited conduct."

On April 27, 2015, Justin Wayne emailed KLAPP, "It was a pleasure having you come by the Lab on Friday.... I think this could be very beneficial for us all to see how [we] can create a mutually beneficial relationship with you."

KLAPP's accounts with Smart included Physician #1, a licensed medical doctor in the State of Florida, who owned and operated a clinic in North Miami Beach, Florida. Physician #1 participated in Medicare Part B. KLAPP's accounts also included Halfway House #1, a halfway house located in Broward County, Florida. Halfway House #1 conducted urinalyses on its residents ordered by a physician licensed in the State of Florida, who also held his own Medicare Identification Number. Physician #1 and Halfway House #1 submitted confirmatory urinalysis specimens for Medicare beneficiaries to Smart.

On January 8, 2016, Justin wrote KLAPP, "Ed, I had billing count up Medicare claims in November and October. 29 for [one treatment center account] and 1 for [Physician #1]. Please discuss with Hawkeye and he will need to tell me on Monday what payout we can give." Later, on January 12, 2016, KLAPP emailed Justin, "[Physician #1] will be handled by me, and is my account.... Most likely [Physician #1] will be moving his account to a lab that does BLOOD [sic] since that's a large percentage of his business."

With respect to Halfway House #1, on January 4, 2016, Justin wrote KLAPP,

> As per the LCD (local coverage determination) of Medicare and Medicaid patients, we can only potentially receive reimbursement on 1 test per week for any Medicare or Medicaid patient. [Halfway House #1] are testing more than once per week and this is a bit of a problem, as we could only collect on ½ of these samples. Also, Medicare needs to see a presumptive test before it goes to definitive testing. This means that each sample needs to have a screening test performed on some level. Does [Halfway House #1] do any of this. I hope so, and we need

to have proof or results sent to us for us to show Medicare. Basically, we will need documentation of this process for all medicare patients. This is only the case due to the frequency of testing of these patients and that a baseline needs to be established.

On January 12, 2016, Justin wrote KLAPP, "Please call me tomorrow …. We need to discuss … [Halfway House #1] and how to maneuver in accordance with the Medicare LCD guidelines."

On January 25, 2016, KLAPP wrote Justin and Hawkeye,

> Guys: Have you received your Medicare certification yet?? If so then I would guess you are billing the Medicare tests I have sent through beginning in October 2015. I don't want to get to the 10th of February only to find out I'm not going to be paid on Medicare. I've been reluctant to send anymore [sic] business since almost all of my doctor clients are at least 50% Medicare[.]

On the same date, Justin responded,

> We are sending out Medicare claims now. We have been certified with Medicare for a few months, we were just sorting out the billing arrangements with them. You got reimbursed for the Oct and Nov claims that we had all necessary billing info on, so you got paid. Your Feb. 10th check will more than likely reflect the other samples sent in prior to Jan. 1; other than those in which we don't have the necessary billing information on…. I will confirm with Billing on the [Halfway House #1] claims that are complete for December that were Medicare.

On the same date, KLAPP responded, "I have asked [Halfway House #1] to resume sending you samples and I believe they sent you 23 last week."

On February 8, 2016, Justin wrote to Hawkeye that Ed was "bringing in mostly Medicare and doctor samples."

On February 10, 2016, KLAPP wrote Justin,

> I did not see any commissions in my payroll check today for MEDICARE business generated from [Halfway House #1]. They have been sending samples since early November and there are nearly 140 we are expecting payment for…. I also have other Medicare business that is expected to be paid from other accounts I have with Smart Lab. Please provide an update.

Claims data shows that on December 3, 2015, Smart billed Medicare Part B for confirmatory urinalysis testing for a Physician #1 patient. Claims data shows that from February 3, 2016 through

3

May 25, 2016, Smart billed Medicare Part B for confirmatory urinalysis testing for Halfway House #1 patients. On February 10, 2016, Smart paid Klapp "commissions" for $454.76, which included KLAPP's commissions for Physician #1's Medicare Part B billing. On March 10, 2016, Smart made two "commissions" payments to Klapp: one for $2,712.37 and one for $22,127.60. The two March payments included KLAPP's commissions for Halfway House #1's Medicare Part B billing. The three payments made on February 10 and March 10, 2016 totaled $25,294.73.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 8/30/2021        By: _____
                           ALEXANDRA CHASE
                           ASSISTANT UNITED STATES ATTORNEY

Date: 3/10/20          By: _____
                           DAVID CLAY TARRAS, ESQ.
                           ATTORNEY FOR DEFENDANT

Date: 3/10/2020        By: _____
                           EDWARD KLAPP IV
                           DEFENDANT